KAMINSKI v. WAYNE COUNTY ROAD COMMISSIONERS.

EVIDENCE—PHOTOGRAPHS—REAL REPRESENTATION OF ACTUAL CONDI-
TIONS—NIGHTTIME COLLISION WITH STREET SWEEPER.

Posed photographic reproduction of operation of defendant's
mechanized street sweeper, taken over 2 years after nighttime
collision had occurred in which minor plaintiff was injured,
*held*, prejudicial and reversible error, where the composite
effect of the photographic reconstruction operation with the
same sweeper, the same operator, photographed in motion, the
reference by defense counsel in his jury argument to the ab-
sence of dust in the pictures, the court's requirement that
jury find presence of dust would have created an unreasonable
hazard, when viewed from the impact of the stark blazing
lights of the sweeper dominating the scene in the photographs,
must have created a wrong impression in the minds of the
jurors that the photographs were a representation of what the
motorist saw as he approached the point of impact, especially
in the absence of precautionary or limiting instructions that
the exhibits were not the usual reasonable representation of
the actual conditions.

Appeal from Wayne; Gilmore (Horace W.), J.
Submitted March 6, 1963. (Calendar No. 73, Docket
No. 49,794.) Decided June 3, 1963.

Case by Sophia Kaminski, next friend of Darlene
Kaminski, against Board of Wayne County Road
Commissioners for personal injuries sustained by
minor in collision of automobile with street sweeper.
Verdict and judgment for defendant. Plaintiff ap-
peals. Reversed and remanded for new trial.

REFERENCES FOR POINTS IN HEADNOTES

20 Am Jur, Evidence § 735.
Admissibility of posed photograph based on recollection of position
of persons or movable objects. 19 ALR2d 877.

*Davidson, Gotshall & Kelly (John J. Beach,* of counsel), for plaintiff.

*Cary, BeGole & Martin (George H. Cary,* of counsel), for defendant.

O'HARA, J.   Darlene Kaminski, a child 8 years old at the time of the happening of the events here involved, was grievously and permanently injured in a collision of 2 vehicles on Grand River avenue in the township of Wayne, Wayne county.

Darlene was a passenger in an automobile owned and operated by her father.  It collided with a motor driven street sweeping machine owned and operated by the Wayne county road commission.  The collision occurred at about 12:30 a.m. on April 15, 1959.

Grand River avenue at the place of collision runs northwest-southeast.   It is a boulevard with the lanes of travel separated by a 75-foot strip of grass. There are 4 lanes for northwest traffic.   In the record for purposes of clarity and convenience, they are designated lanes 1, 2, 3, and 4 from a northwesterly bound driver's left.   The westernmost lane nearest the grass strip is then lane 1, the next easterly thereof lane 2, the next easterly lane 3, and the one closest to the east curb, sometimes used for parking, is lane number 4.

At the place in question, near Wakendon, an intersecting street, the speed limit is 45 miles per hour. Darlene's father was traveling 40 miles per hour, or thereabouts, in lane number 2.   Darlene was in the front seat with him.   She had requested that she be allowed to accompany him to his church league bowling league, a privilege her younger brother had been granted the week before.   On a promise to do her home work after school and take a nap before the 9 p.m. starting time for her father's team, she

was allowed to go. It was on the return trip at the time previously specified the collision occurred.

Contemporaneously with Mr. Kaminski's use of Grand River avenue that night, the Wayne county road commission was performing its statutorily imposed duty of maintaining the highway also designated as US-16. Through its agent and employee, it was operating a large mechanized street sweeping machine; its overall width some 9 feet. Mr. Kaminski's automobile struck the street sweeper, occasioning thereby to Darlene, the injuries previously mentioned. Sophia, Darlene's mother was appointed her next friend and in that capacity brought action against the board of Wayne county road commissioners, which owned and operated the street sweeper.

In her declaration, the next friend alleged that the sweeper was negligently operated in particulars specified as subparagraphs (a) through (g) of paragraph 5. Subparagraphs (b) and (g) are purely conclusionary; subparagraph (a) charges a failure to equip with safety and warning devices; (c) alleges failure of observation of the "conditions of the road and of vehicles about the site of its operation"; (d) complains that the sweeper and its attendant created a "hazardous and unsafe road condition"; (e) asserts that defendant allowed improperly trained personnel to operate the sweeper; (f) is a restatement of (a) substituting "equipment" for "devices."

On these somewhat general allegations issue was joined by answer denying them categorically and by alleging that defendant equipped the device with adequate and proper warning devices and that the operator was in the exercise of due care.

The pretrial statement frames the issue as "largely factual" and particularizes the alleged negligence as the operation of the sweeper in a manner that

"obscured the vision of approaching vehicles (drivers?)."

A factual question was created by the following testimony which really contains the solidly joined issue of negligence.

A witness for plaintiff who passed the sweeper shortly before the accident testified as follows:

"All of a sudden through this haze-like affair, I noticed a glow of light, rather high, and I was no more than maybe, oh, 2 car lengths, roughly 2 car lengths, from this, and I immediately pulled to the right into the next lane to avoid this, this object. I didn't know what it was at that time. When I got beside it, I noticed that it was a sweeper, and when I got in front of it *then* I could see on the front there were lights, and I knew for sure *then* that it was a sweeper." (Emphasis supplied.)

There follows additional testimony which identifies the haze as dust, "just a mass of dust" and testimony that the subpoenaed witness, Miss Wolfe, had to swerve her car "very sharply" to avoid a collision.

Charles A. Quigley, another witness not only to the operation of the sweeper at the time and place involved but to the accident itself, thus testified:

"*Q.* Now will you tell the jury how much, if any, dust there was in the vicinity of this sweeping device at the time this happened, if you recall?

"*A.* I think the best way to answer that is that there was not enough dust to obscure my vision or view of this red beacon light. How much dust I don't know."

Clearly then with the background of the pretrial statement, the declaration, the testimony of the operator as to the watering device provided on the machine to allay dust, and Mr. Quigley's admission on cross-examination that he had previously de-

scribed in a deposition, road sweepers as "creating a hell of a lot of dust" the hard core issue was: Did the road sweeper in question create enough dust so that the lighting equipment carried, would not adequately warn other motorists of its presence and operation on the highway?

The jury apparently answered "no" for its verdict was no cause of action. Or at least if its answer was "yes" then it determined that such inadequacy, if any, was not a proximate cause of Darlene's injuries.

Here then rises the meritorious issue on appeal. In preparation for the defense of this action, defendants at night, in June of 1961 and in October of 1961 (the accident happening on April 15, 1959), took photographs, both colored and black and white, together with motion pictures at the scene. The same sweeper was placed at a point fixed by witnesses as some 200 feet and 50 feet back from the point of impact. The same operator was placed on the machine, and almost incredibly except in television trials, the same witness, Mr. Quigley, who witnessed the accident came by and stopped while the pictures were being taken. He testified on cross-examination:

"*A.* I had a curiosity as to what was going on; it looked so similar to the original scene.

"*Q.* In other words, it was taking place at Wakendon?

"*A.* Yes.

"*Q.* But there is no question in your mind that back in the early morning hours of April 15, 1959, there was considerable dust from this equipment?

"*A.* Yes.

"*Q.* When they *re-enacted* this thing on October 3, 1961, did you see any dust?

"*A.* Oh, no.  * * *

"*Q.* When you saw this being *re-enacted* in June of 1961, this vehicle had a yellow oscillating light?

"*A.* Yes, sir.

"*Q.* Back in 1959, the beacon or the oscillating light that you saw was red, is that your recollection?

"*A.* Yes, sir." (Emphasis supplied.)

Two of the photographs of the scene, with the sweeper in place and the operator at the controls, then were offered as exhibits 16 and 17. Over 20 pages of preparatory testimony is devoted to identifying and explaining them. The photographer testified that exhibit 17 was taken at 200 feet with the sweeper stationary and exhibit 16 while it was in movement. When the qualifying direct examination and the disqualifying cross were completed, plaintiff's counsel addressed the Court:

"*Mr. Gotshall:* Your Honor, I am going to object to these photographs. In the first place, I don't know what they are intended to show. We have photographs of the *actual equipment that was involved.*" (Emphasis supplied.)

In his address to the jury, defense counsel said:

"So we have given you pictures, movies, the pictures of *the operation* of this machine at 200 feet \* \* \* small pictures, and at 50 feet *in operation, and if dust was available it should* show in the operation there." (Emphasis supplied.)

The court in his charge to the jury pointed out:

"That any condition of dust resulting from *the operation of the sweeper involved in this accident must have created an unreasonable hazard or danger* (to sustain recovery)."

Since the whole thrust of plaintiff's case was the allegation of negligent creation of a dust hazard coupled with lighting inadequate to forewarn other users of the street of the presence, identity, and

operation of the machine, and since exhibits 16 and 17 had been referred to as a "re-enactment" as they were taken at night under conditions as they presumably existed the night of the accident, we consider in legal essence the "posed photograph rule," and the conditions of admissibility of such reconstructed photographs based upon the hypotheses of witnesses' memories for the simulation.

20 Am Jur, Evidence, § 735, p 613 observes:

"There is a decided conflict of authority as to whether or not photographs of an attempted reproduction of the scene of a crime or accident as recalled by witnesses, showing posed persons, dummies, and movable objects, are admissible to illustrate the contention of the party offering them as to the relative positions of such persons and movable objects so represented at the time and place of the crime or accident involved in the litigation under consideration. Many courts look with disfavor upon the admission of such photographs. Objection to the admission of posed photographs based on recollection as to the position of moving objects is, however, by no means universal. Such photographs have, in a number of cases, been held admissible where a proper foundation therefor has been laid by preliminary testimony showing that the objects and situations portrayed are faithfully represented as to position."

The subject is annotated extensively in 27 ALR 913–920, incident to the holding in *Nunnelley's Administrator* v. *Muth,* 195 Ky 352 (242 SW 622). 19 ALR2d 877 extends the annotation to include more recent cases. At page 879, the general holdings are thus explained:

"It has often been stated that although photographs are admissible to accurately show conditions existing at the time in question, the contrary is true when the photographs attempt to show more than

this, with persons in various assumed positions, and things in various assumed situations, in order to illustrate the hypothetical claims and contentions of the parties. It is evident that this 'hypothesis' exclusionary rule, insofar as it contrasts a hypothetical with an actual situation, is close akin to, if not a mere phase of, the 'accuracy' test."

See, also, case notes 14 NCCA NS 401 *et seq.*, supplementing 1 NCCA NS 633.

The only Michigan case contained in the ALR annotation is *Harrison* v. *Green,* 157 Mich 690, listed as supporting the admissibility. The later ALR annotation includes no Michigan authority. *Harrison* is not controlling of the issue here nor does it purport to be. It is authority for what was there decided, the position of plaintiff in relation to the machine at the time of the injury and the position of 2 witnesses to the accident. Further the court pointed out:

"Plaintiff on cross-examination was shown this photograph, and testified that it correctly represented the interior of the room and the situation of the machine. He then pointed out on the photograph where he stood and where the boys stood." *Harrison, supra,* 694.

The picture in no wise purported to represent how the machine operated, nor did it purport to portray a hypothetical theory of one party as distinguished from an actual situation—a static condition agreed upon as a fair representation by the parties.

Unfortunately here there is no response by defense counsel, or comment or specific ruling by the court on plaintiff's counsel's objection:

"In the first place, I don't know what they are intended to show."

Neither do we. However, in further objection, counsel continued:

"*So if this is offered for the purpose of showing the condition that existed on April 14 or 15, 1961 [1959?], it is highly objectionable,* * * * and also in conjunction with Mr. Quigley's testimony, he testified that when he was there at the scene the conditions were entirely different between 1959 and 1961.

"*The Court:* I think those objections go to the weight. I will receive exhibits 16 and 17." (Italics supplied.)

However, the composite effect of the photographic reconstruction operation with same sweeper, the same operator, photographed in motion, the reference by defense counsel in his jury argument to the absence of dust in the pictures, the court's requirement that the jury find the presence of dust that "would have created an unreasonable hazard"—all these when viewed from the impact of the stark blazing lights of the sweeper dominating the scene in the photographs could not fail to have created in the minds of the jurors the impression that exhibits 16 and 17 were a representation of what the minor's driver-father saw as he approached the point of impact the night of the collision. This all the more so by reason of the absence of any precautionary or limiting instruction by the court that the exhibits were not the usual "reasonable representation" of the actual conditions. That the posed photographic reproduction was not agreed upon and not mutually accepted as fairly representative of what the minor's driver was confronted with, is amply established by the following testimony:

"*By Mr. Gotshall:*
"*Q.* When were these taken?
"*A.* June 27, 1961.
"*Q.* Did you make an examination of the scene before?
"*A.* We drove by there, yes.

"*Q.* Did you go down and check to see how much dirt was on the side of the road?

"*A.* No, I did not.

"*Q.* Did you yourself make any investigation of the dirt conditions that existed on April 14 and April 15, 1959?

"*A.* No, I did not.   *   *   *

"*Q.* Did you make an investigation along Grand River avenue and U. S. Highway 16 as to what establishments were open on the particular night of April 14 and 15, 1961 [1959?], as to background light?

"*A.* No, I did not.

"*Q.* Do you know how many buildings have since been built in that general area since April 14 or 15, 1959, and the present date?

"*A.* No, I don't.

"*Q.* Do you know how many lights were along the borders of U. S. Highway 16, that would be on the right side if you are going northwest, with reference to neon signs or anything else?

"*A.* As to the difference from the time of the accident?

"*Q.* Yes.

"*A.* No, I do not.   *   *   *

"*Q.* There were some of this film taken with flood lights?

"*A.* Yes, 30 feet.   *   *   *

"*Q.* Did you conduct an investigation to find out what the wind direction was on the night of April 14th and early morning hours of April 15th and the wind direction on June 27, 1961?

"*A.* No, I did not.   *   *   *

(Two photographs were marked defendant's exhibits Nos. 16 and 17.)"

That the able trial judge may have had some misgivings as to their admissibility is suggested in his comment in denying plaintiff's motion for a new trial:

"The Court wants to comment on 2 further things in denying the motion for a new trial. In this case

the jury was out approximately 20 minutes before it returned a verdict of no cause for action. These photographs were introduced at least 2 days prior to the time of the deliberation of the jury. At no time did the jury ask to see the photographs in their jury room. The court, I think, can properly assume from that that the jury did not deem these pictures controlling.

"Second, the court points out that even if there were error here in the admissibility and the act having been done, at no time was Mr. Kaminski put back on the stand to make any denial that these photographs were not similar to the conditions existing the night of the accident. The court feels first that there was a proper foundation laid for the introduction of the pictures; that the objection here does not go to the admissibility but rather to weight and, therefore, feels that it was not error to receive them; but rather states that even if it was error to receive them, the error was not prejudicial error in this case."

We cannot agree that the court could properly assume that the jury did not deem these pictures controlling. Nor do we feel that it was obligatory (though it might well have been desirable from plaintiff's standpoint) to recall Mr. Kaminski to deny the similarity of the re-enacted conditions to those existing on the night of the accident. This was elicited by the cross-examination heretofore set out.

Under any interpretation of the "accuracy rule" relating to the admissibility of photographs, posed or otherwise, the exhibits did not meet the admissibility test of reasonable representation. Their admission was error and we cannot say that such error was not prejudicial. To do so would be to speculate on the weight of evidence, reserved to the trier of the facts.

Regrettably perhaps, because the trial was long and expensive, we must reverse for the error specified.

The order denying the motion for a new trial is vacated and the case remanded with directions to enter an order granting a new trial. Costs to the plaintiff.

CARR, C. J., and DETHMERS, KELLY, BLACK, KAVANAGH, SOURIS, and SMITH, JJ., concurred.